FILED

U.S. DISTRICT COURT

AUG 03 2018

DS
S.D. OF N.Y.

ORIGINAL

Approved: _Daniel Nessim_
DANIEL G. NESSIM
Assistant United States Attorney

Before:   THE HONORABLE BARBARA C. MOSES
          United States Magistrate Judge
          Southern District of New York

18 MAG 6658

- - - - - - - - - - - - - - - - - - - X
                                       :
UNITED STATES OF AMERICA               :
                                       :
     - v. -                            :
                                       :
MIYUKI SUEN,                           :
JIAN MIN HUANG,                        :
SONGHUA QU,                            :
KIN LUI CHEN, and                      :
FANGRANG QU,                           :
                                       :
                                       :
              Defendants.              :
                                       :
- - - - - - - - - - - - - - - - - - - X

SEALED COMPLAINT

Violations of
18 U.S.C.
§§ 2320 and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JASON PETRI, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

## COUNT ONE
(Counterfeit Trafficking Conspiracy)

1.   From at least in or about January 2016, up to and including July 2018, in the Southern District of New York and elsewhere, MIYUKI SUEN, JIAN MIN HUANG, SONGHUA QU, KIN LUI CHEN, and FANGRANG QU, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree, together and with each other, to commit an offense against the United States, to wit, trafficking in counterfeit goods or services, in violation of Title 18, United States Code, Section 2320(a)(1).

2.   It was a part and an object of the conspiracy that MIYUKI SUEN, JIAN MIN HUANG, SONGHUA QU, KIN LUI CHEN, and FANGRANG QU, the defendants, and others known and unknown, knowingly and

1

intentionally did traffic in goods and services, and did knowingly use a counterfeit mark on and in connection with such goods and services, in violation of Title 18, United States Code, Section 2320(a)(1).

**OVERT ACT**

3. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a. On or about May 16, 2018, JIAN MIN HUANG, the defendant, called a confidential law enforcement source (identified herein as "CS-1") and told him, in sum and substance, that she would be able to sell CS-1 counterfeit Nike Air Jordan sneakers soon.

(Title 18, United States Code, Section 2320.)

**COUNT TWO**
(Trafficking in Counterfeit Goods)

4. From at least in or about January 2016 up to and including July 2018, in the Southern District of New York and elsewhere, MIYUKI SUEN, JIAN MIN HUANG, SONGHUA QU, KIN LUI CHEN, and FANGRANG QU, the defendants, knowingly and intentionally did traffic and attempt to traffic in goods and services, and did knowingly use a counterfeit mark on and in connection with such goods and services, to wit, SUEN, SONG QU, HUANG, CHEN, and FANG RANG QU distributed counterfeit Nike Air Jordan sneakers.

(Title 18, United States Code, Sections 2320 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Detective with the NYPD and a member of the joint NYPD and Department of Homeland Security, Homeland Security Investigations ("HSI") Border Enforcement and Security Task Force. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with other law enforcement officials, and on my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others

2

are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

6.   Since approximately January 2018, NYPD and HSI have been investigating a group of people, including, among others, MIYUKI SUEN, JIAN MIN HUANG, SONGHUA QU, KIN LUI CHEN, and FANGRANG QU, the defendants, who are involved in the trafficking of counterfeit Nike Air Jordan sneakers (the scheme is referred to herein as "Counterfeit Sneaker Ring," and the sneakers are referred to herein as the "Counterfeit Air Jordans").

7.   Based on my training and experience, involvement in this investigation, and review of publicly available information, I have learned that Nike's Air Jordan line of sneakers are some of the most popular and expensive athletic shoes in circulation. Nike has released a different Air Jordan model almost every year since the shoe line was first introduced in 1984. Many of these models are known by their model number (e.g. Air Jordan XIII, the thirteenth model in the line), but some are known by the year the model was introduced (e.g. Air Jordan 2009, the Air Jordan model introduced in 2009). Depending on the version, colors, and rarity, Air Jordan sneakers can cost from approximately $100 up to the thousands of dollars.

8.   Based on my involvement in this investigation, I have learned that the Counterfeit Sneaker Ring imports containers filled with sneakers manufactured in China. These sneakers are produced to resemble Air Jordan sneakers in design and color, but, significantly, are "generic" (the "Generic Air Jordans"). That is, these sneakers are imported into the United States without the inclusion of logos that are trademarks registered with the United States Patent and Trademark Office ("USPTO"). Once the Generic Air Jordans arrive in the United States, they are altered within the New York area to add trademarked logos to the shoes. Once this alteration takes place, the shoes are considered "counterfeit." Thus, the Counterfeit Sneaker Ring arranges for the importation of Generic Air Jordans, the addition of UPSTO-trademarked logos and marks to Generic Air Jordans to make them Counterfeit Air Jordans, and, finally, the distribution of Counterfeit Air Jordans within the United States at a significant profit.

9.   As described further below, on several occasions, NYPD and HSI officers and agents (i) inspected shipping containers carrying large quantities of Generic Air Jordans that listed a company affiliated with the Counterfeit Sneaker Ring as the

consignee (the "Counterfeiting Company"),[1] see infra ¶¶ 15-17, and then (ii) surveilled the containers as they were transported from the port in New Jersey to locations used by the Counterfeit Sneaker Ring in Brooklyn and Queens, New York, where they were often unloaded at the direction of KIN LUI CHEN and MIYUKI SUEN, the defendants, see infra ¶¶ 15-17.

10. Based on my training and experience, I submit there is probable cause to believe that the containers carrying Generic Air Jordans were transported in and through the Southern District of New York because it is not possible to use road vehicles to get from New Jersey to Brooklyn and/or Queens without being present in and crossing through the Southern District of New York.

11. As part of this investigation, the NYPD and HSI have made use of a particular confidential source of information ("CS-1"), who has purchased Counterfeit Air Jordans from the Counterfeit Sneaker Ring, including JIAN MIN HUANG and FANGRANG QU, the defendants.[2]

12. Based on my review of shipping records maintained by United States Customs and Border Protection ("CBP Records" and "CBP," respectively), I have learned that the Counterfeiting Company has been listed as the consignee on at least forty-two containers shipped from China to the Port of Newark, New Jersey from January 2016 through March 2018. The CBP Records list the contents of each of these containers as "SHOES."

13. Based on the number of Counterfeiting Company-associated containers imported per the CBP Records as well as my my personal inspections of some of those containers, I estimate that the Counterfeit Sneaker Ring has imported approximately 385,280 Generic Air Jordans from China between January 2016 and March 2018. Based on my conversations with Nike representatives, I have learned that, if the sneakers in question were authentic Nike Air Jordans, they would retail for $190 per pair. Accordingly, I estimate the loss attributable to the Counterfeit Sneaker Ring is at least approximately $73.2 million.

---

[1] A consignee is the individual or entity financially responsible for receipt of the given container (i.e. the "buyer" of the goods in the container).

[2] CS-1 has been a law enforcement source for approximately two years. During that time, CS-1's information has been deemed reliable and has sometimes been corroborated by independent evidence.

**Inspected Containers**

The Initial Investigation

14.   Based on my involvement in this investigation, including my review of reports and conversations with other law enforcement officers, I have learned the following:

a.   In or about June 2017, HSI received information from a private investigative firm located in New York (the "Investigative Firm"). The Investigative Firm is associated with Nike and helps to identify and investigate unauthorized use of Nike's intellectual property.

b.   The Investigative Firm learned of the containers being shipped to the United States for the benefit of the Counterfeiting Company and believed that the containers might contain counterfeit Nike products. As a result, the Investigative Firm began conducting surveillance to ascertain the individuals involved with the Counterfeiting Company.

c.   Based on my conversations with representatives of the Investigative Firm and my review of documents maintained by the Investigative Firm, I have learned that the Investigative Firm surveilled the Counterfeit Sneaker Ring on numerous occasions beginning on or about June 12, 2017 and lasting through the period where the NYPD and HSI investigation began.   Over the course of this surveillance, they observed newly arrived Containers be moved from New Jersey to two locations in Queens, New York associated with the Counterfeit Sneaker Ring – "Location-1" and "Location-2."   Once the containers arrived at these locations, individuals would remove large brown boxes bearing diamond emblems from the containers and move those boxes into Location-1 and/or Location-2.   Over the course of this surveillance, Investigative Firm employees often observed an individual, later identified through photographs maintained in New York Department of Motor Vehicles ("DMV") and immigration records as KIN LUI CHEN, the defendant, transport these diamond-printed boxes and direct others as they unloaded the boxes.

First Inspected Container

15.   Based on my personal involvement in the inspection and surveillance described below, as well as my conversations with other law enforcement officers and employees of the Investigative Firm with personal knowledge of the inspection and surveillance described below, I have learned the following:

5

a.     On or about January 31, 2018, along with HSI agents, I inspected a recently arrived shipping container (the "First Inspected Container") at a storage yard in New Jersey (the "New Jersey Yard").

b.     CBP Records indicated that the First Inspected Container came from China, that the Counterfeiting Company was the intended consignee, and that the Container was carrying "SHOES."

c.     The inspection of the First Inspected Container revealed that the Container held 560 large brown boxes, each containing 16 pairs of Generic Air Jordans.  The boxes had lettering printed on the side that included a code, for example, "CF1701507-2" as well as a color, for example "COLOR: BLACK GREY RED."  The boxes also included a diamond design.

d.     Based on my observations during this inspection, review of publicly available information concerning Nike Air Jordans, and my conversations with Nike representatives, I understand that:

i.     The color listed on the side of each box corresponded with the color of sneakers contained within the box.

ii.     The two digits immediately preceding the dash in the code referenced the Air Jordan model that the Generic Air Jordans in question were manufactured to resemble. For example, a code that ended with "07" before the dash referred to Air Jordan VII shoes, and a code that ended with "13" before the dash referred to Air Jordan XIII shoes.

iii.     For example, the boxes referenced above in paragraph 15(c) contained Generic Air Jordans in black, grey, and red, which resembled the Air Jordan VII shoes.

e.     The inspection of the First Inspected Container revealed that it held ten different styles of Generic Air Jordans.

f.     From on or about February 5, 2018 through February 6, 2018, the First Inspected Container was moved from the New Jersey Yard to another facility in New Jersey and then on to a storage facility in Brooklyn (the "Brooklyn Facility").

g.     On or about February 6, 2018, the First Inspected Container was moved from the Brooklyn Facility to Location-1.  Once the First Inspected Container arrived at Location-1, KIN LUI CHEN, the defendant, was observed directing others in unloading the boxes of Generic Air Jordans from the First Inspected Container and

6

placing them in the loading dock area of Location-1. CHEN was then observed moving a truck toward the loading dock and then directing others to load some of the boxes containing Generic Air Jordans into the truck until the truck was full. Several hours later, CHEN transported the truck full of Generic Air Jordans to Location-2. Once CHEN arrived, he and other individuals unloaded the boxes of Generic Air Jordans into Location-2.

### Second Inspected Container

16. Based on my personal involvement in the inspection and surveillance described below, as well as my conversations with other law enforcement officers and employees of the Investigative Firm with personal knowledge of the inspection and surveillance described below, I have learned the following:

a. On or about February 26, 2018, along with HSI agents, I inspected a recently arrived shipping container at the New Jersey Yard (the "Second Inspected Container").

b. CBP Records indicated that the Second Inspected Container came from China, that the Counterfeiting Company was the intended consignee, and that the Container was carrying "SHOES."

c. The inspection of the Second Inspected Container revealed that the Container held 560 large brown boxes, each containing 16 pairs of Generic Air Jordans. The boxes bore the same diamond decal and lettering scheme observed in the boxes inspected in the First Inspected Container (*see supra* ¶ 15(c)). In total, the Second Inspected Container transported nine different styles of Generic Air Jordans.

d. On or about March 5, 2018, the Second Inspected Container was moved from the New Jersey Yard to the Brooklyn Facility.

e. On or about March 6, 2018, the Second Inspected Container was moved from the Brooklyn Facility to a Queens location associated with the Counterfeit Sneaker Ring ("Location-3"). Once the Second Inspected Container arrived at Location-3 an individual, later identified through photographs maintained in DMV, law enforcement, and immigration records as MIYUKI SUEN, the defendant, was observed directing others as they unloaded boxes from the Second Inspected Container into Location-3.

## Third Inspected Container

17. Based on my personal involvement in the inspection and surveillance described below, as well as my conversations with other law enforcement officers and employees of the Investigative Firm with personal knowledge of the inspection and surveillance described below, I have learned the following:

    a. On or about March 8, 2018, along with HSI agents, I inspected a recently arrived shipping container at the New Jersey Yard (the "Third Inspected Container").

    b. CBP Records indicated that the Third Inspected Container came from China, that the Counterfeiting Company was the intended consignee, and that the Container was carrying "SHOES."

    c. The inspection of the Third Inspected Container revealed that the Container held 560 large brown boxes, each containing 16 pairs of Generic Air Jordans. The boxes had the same diamond design and lettering scheme observed in the boxes inspected in the First and Second Inspected Containers (*see supra* ¶¶ 15(c), 16(c)). In total, the Third Inspected Container transported thirteen different styles of Generic Air Jordans.

    d. On or about March 13, 2018, the Third Inspected Container was moved from the New Jersey Yard to the Brooklyn Facility.

    e. On or about March 14, 2018, the Third Inspected Container was moved from the Brooklyn Facility to Location-3. Once the Third Inspected Container arrived at Location-3, MIYUKI SUEN, the defendant, was observed leading the unloading of boxes from the Third Inspected Container into Location-3.

## CS-1 Buys Counterfeit Air Jordans

18. Based on my involvement in this investigation, I have learned that, at the direction of law enforcement, CS-1 has purchased Counterfeit Air Jordans from the Counterfeit Sneaker Ring at least nine times — on or about March 29, 2018; April 9, 2018; May 3, 2018; May 7, 2018; May 9, 2018; June 7, 2018; June 8, 2018; June 9, 2018; and June 28, 2018 (the "CS Buys").

    a. Based on my involvement in this investigation, I know that on each occasion, CS-1 communicated his desire to purchase Counterfeit Air Jordans to an individual, later identified through photographs maintained in DMV and immigration records as JIAN MIN HUANG, the defendant.

8

b.    Based on surveillance I conducted in connection with the May 7, 2018 CS Buy, I know that on or about May 7, 2018, a van arrived at Location-3 and was loaded with boxes. The van then proceeded directly from Location-3 to the location of the CS Buy, where individuals unloaded five cases of Counterfeit Air Jordans to sell to CS-1.

c.    Based on surveillance I conducted in connection with the May 9, 2018 CS Buy, I know that on or about May 9, 2018, a truck arrived at Location-3 and was loaded with boxes. The truck then proceeded directly from Location-3 to the location of the CS Buy, where individuals unloaded ten cases of Counterfeit Air Jordans to sell to CS-1.

d.    Based on my review of a conversation between CS-1 and HUANG recorded on or about May 16, 2018, I have learned that HUANG told CS-1 that she, along with other members of the Counterfeit Sneaker Ring, was concerned that law enforcement was aware of their scheme and that the co-conspirators were being watched and/or followed. This fear of surveillance would also delay deliveries of Counterfeit Air Jordans by some time, possibly a week. HUANG also told CS-1 that Counterfeit Air Jordans mimicking the XIII model line could likely be expected in the next several weeks, but that the Counterfeit Sneaker Ring could provide Counterfeit Air Jordans resembling the XI line soon.

e.    Based on surveillance I conducted in connection with the June 7, 2018 CS Buy, I know that on or about June 7, 2018, I observed a van pull up to Location-3 and I watched an individual, later identified through photographs maintained in DMV and immigration records as SONGHUA QU, the defendant, along with other individuals, load the van with boxes. The van then proceeded directly from Location-3 to the location of the CS Buy, where the individuals unloaded five cases of Counterfeit Air Jordans to sell to CS-1.

f.    Based on my conversations with a representative of Nike, I understand that Nike considers all of the Counterfeit Air Jordans purchased by CS-1 to be counterfeit. That is, the Counterfeit Air Jordans from the CS Buys bear logos and marks that are in violation of trademarks registered by Nike with the USPTO.

g.    Based on my review of the Counterfeit Air Jordans, purchased by CS-1, I believe they are the counterfeit versions of the Generic Air Jordans I previously observed in the Inspected Containers, *see supra* ¶¶ 15(c), 16(c), 17(c). Specifically, the boxes that the Counterfeit Air Jordans came in had the same diamond decal and numbering scheme I had previously observed.

9

**Other Surveillance and Information Concerning the
Counterfeit Sneaker Ring**

19.    Based on a conversation I had with an individual who is familiar with the tenants and leases at Location-2 and my review of surveillance footage, I have learned that on or about March 23, 2018, MIYUKI SUEN, the defendant, arrived at Location-2 with several other individuals and loaded hundreds of boxes into two trucks.    This activity left the Counterfeit Sneaker Ring's space at Location-2 almost entirely empty.    Based on my training and experience, I believe that the boxes that were removed from Location-2 contained Counterfeit Air Jordans because the boxes in the surveillance footage were more heavily taped than the boxes I have observed containing Generic Air Jordans.    This extra application of tape indicates that the boxes of Generic Air Jordans were opened, the Generic Air Jordans were manipulated to include Counterfeit trademarks and logos, the newly Counterfeit Air Jordans were returned to the boxes, and extra tape was applied to the boxes to seal them.

20.    Based on surveillance I conducted, I know that on or about June 1, 2018, on or about June 4, 2018, and on or about June 6, 2018, SONGHUA QU and an individual later identified through a review of photographs contained in DMV, immigration, and law enforcement records as FANGRANG QU, the defendants, were observed at Location-3 and loading boxes from a vehicle into Location-3. These boxes closely resembled the boxes I had previously observed in the Inspected Containers and in connection with the CS Buys, *see supra* ¶¶ 15(c), 16(c), 17(c), 18(g).

21.    Based on my communications with law enforcement who conducted surveillance, I have learned that on or about June 13, 2018, FANGRANG QU, the defendant, arrived at a storage facility in Queens (the "Queens Storage Facility").    Once there, F. QU loaded several boxes into his vehicle.    Like the boxes previously observed in connection with the Counterfeit Sneaker Ring, *see supra* ¶¶ 15(c), 16(c), 17(c), 18(g) 20, these boxes bore a diamond design.

22.    Based on surveillance I conducted, I know that on or about June 15, 2018, a truck pulled up to Location-3.    Once there, SONGHUA QU, the defendant, and other individuals unloaded boxes from the truck into Location-3.    Later that day, S. QU and FANGRANG QU, the defendants, loaded additional boxes from Location-3 into another vehicle.    All of the boxes observed bore the same diamond prints previously seen in connection with the Counterfeit Sneaker Ring, *see supra* ¶¶ 15(c), 16(c), 17(c), 18(g), 20, 21.

23.   Based on surveillance I conducted, I know that on or about June 21, 2018, a truck pulled up to Location-3.  Once there, SONGHUA QU, the defendant, and other individuals loaded boxes from Location-3 onto the truck.  All of the boxes observed bore the same diamond prints previously seen in connection with the Counterfeit Sneaker Ring, *see supra* ¶¶ 15(c), 16(c), 17(c), 18(g), 20–22.

24.   Based on surveillance I conducted, I know that on or about July 13, 2018, a vehicle pulled up to Location-3.  Once there, SONGHUA QU and FANGRANG QU, the defendants, and other individuals loaded boxes from Location-3 into the vehicle.  All of the boxes observed bore the same diamond prints previously seen in connection with the Counterfeit Sneaker Ring, *see supra* ¶¶ 15(c), 16(c), 17(c), 18(g), 20–23.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of MIYUKI SUEN, JIAN MIN HUANG, SONGHUA QU, KIN LUI CHEN, and FANGRANG QU, the defendants, and that they  be imprisoned or bailed, as the case may be.

_____

JASON PETRI
Detective
New York City Police Department


Sworn to before me this
3rd day of August, 2018

_____
THE HONORABLE BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK